COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Annunziata and Agee
Argued at Alexandria, Virginia


THELMA RUTH TAYLOR
                                    MEMORANDUM OPINION[*] BY
v.    Record No. 1074-02-3          JUDGE LARRY G. ELDER
                                       NOVEMBER 12, 2002
WASHINGTON COUNTY DEPARTMENT
 OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
                   Charles B. Flannagan, II, Judge

            Sage B. Johnson (Johnson & Johnson, P.C., on
            brief), for appellant.

            Edward G. Stout (Bressler, Curcio & Stout, on
            brief), for appellee.

            Patricia E. Smith (Bradford & Smith, P.C.,
            on brief), Guardian ad litem for the minor
            child.


     Thelma Taylor (appellant) appeals a decision of the trial

court terminating her parental rights to her son, J., pursuant to

Code § 16.1-283(C).  On appeal, appellant contends the evidence

was insufficient to support the termination.  We hold clear and

convincing evidence supported the termination, and we affirm.

     Although the trial court did not specifically state under

which subsection of the statute it found termination of

appellant's parental rights to be appropriate, DSS's evidence

---

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

and the tenor of the trial court's ruling make clear that the termination occurred pursuant to Code § 16.1-283(C)(2). That subsection requires proof, by clear and convincing evidence, (1) that the termination is in the best interests of the child,[1] (2) that "reasonable and appropriate" services have been offered to help the parent "substantially remedy the conditions which led to or required continuation of the child's foster care placement," and (3) that, despite those services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care." Code § 16.1-283(C)(2).

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but . . . [less than] a reasonable doubt . . . ." Gifford v. Dennis, 230 Va. 193, 198 n.1, 353 S.E.2d 371, 373 n.1 (1985). We view the evidence in the light most favorable to the party prevailing below and grant to that evidence all reasonable inferences fairly deducible therefrom. Logan v. Fairfax County

---

[1] Appellant does not appear to contest the sufficiency of the evidence to prove that termination was in J.'s best interests.

-

_____, 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

We are mindful of the principle that "[t]he termination of residual parental rights is a grave, drastic and irreversible action," Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991), but we "'presume[] [the trial court has] thoroughly weighed all the evidence [and] considered the statutory requirements,'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).  The court is not required to state its findings of fact and conclusions of law with specificity as long as the record contains evidence to support its decision.

The evidence in the record, viewed in the light most favorable to the Commonwealth, proved, by clear and convincing evidence, both (1) that DSS made "reasonable and appropriate efforts" to help appellant remedy the conditions "which led to or required continuation of the child's foster care placement" and (2) that appellant, without good cause, failed "to substantially remedy" those conditions within a reasonable period of time.  In reaching this conclusion, the court was required by Code § 16.1-283(C)(2) to "take into consideration the prior efforts of such agencies to rehabilitate the parent."

The evidence established a finding of abuse/neglect was made when J. was only two months old.  Although appellant

-

recognized her need for assistance in caring for J. and requested services from DSS within a week of his birth, she was a teenager with limited intellectual capacity and was unable to follow instructions regarding her handling and comforting of J. Appellant failed to support the newborn's neck and was so rough with him that two different DSS employees, Eleanor Thayer and Robin Anderson, had "grave concerns" for J.'s safety and "the potential for shaken baby syndrome." Anderson explained to appellant that this behavior "could hurt [J.'s] brain." Appellant exhibited some understanding of the warning because her "behavior would change" and "she would be more gentle" with J. "for a couple of minutes," but then appellant would revert to the same dangerous behavior. Anderson and Thayer cautioned appellant repeatedly about this risk, but their efforts caused no lasting change in appellant's behavior. On May 16, 2000, DSS removed J. from appellant's home and placed him in foster care based on the "[s]ignificant risk" to J. "for trauma because of the physical abuse" Anderson had observed.

Although the immediate cause of J.'s removal was physical abuse in the form of appellant's rough handling, appellant also had demonstrated difficulty with other parenting skills, such as how often to feed, burp and bathe J., where to put him to sleep safely, and what developmental milestones to foster and watch for. A parenting assessment indicated J.'s return to appellant's home would place him "at significant risk because

-

[appellant] displayed an inability to comprehend and consistently apply appropriate parenting skills."  DSS developed a foster care service plan with a goal of returning J. to appellant which attempted to address these problems.  The plan required appellant to "learn how to consistently provide suitable child care in areas such as handling [and] feeding," to "secure employment, transportation, and budgeting skills in order to support herself," and to "maintain stable housing and needed baby equipment."  Pursuant to the plan, appellant received ongoing homemaker services from DSS's Eleanor Thayer, parenting classes, transportation and employment services.

Beginning in November 2000, DSS permitted appellant to have overnight visits in her home with J., and that visitation gradually increased.  In January 2001, J. began to stay in appellant's home from Monday morning until Friday afternoon.  Thayer continued to provide homemaker services at that time.  Although appellant was cooperating with services, DSS determined the homemaker services were insufficient to meet appellant's needs.  Beginning February 22, 2001, DSS replaced the homemaker services with parent aide services, which allowed the aide to "go [into appellant's home] more often and over a longer period of time."  Thereafter, with the exception of a two-week period in July, aide Ruth Atkins was in appellant's home on a daily basis through August 23, 2001.

-

At first, appellant worked well with Atkins and "really tried."  The report of a court-appointed special advocate (CASA advocate) concluded that appellant needed ongoing support in parenting J. but that she was able to care for J. as long as she received that support.  The advocate recommended that J. be returned to appellant.  DSS arranged to return physical custody of J. to appellant in May 2001, but at about that time, appellant stopped trying to cooperate with DSS's services.  DSS returned J. to appellant's physical custody on May 16, 2001, but at the request of DSS, the court entered a protective order to "give [DSS] some leverage with [appellant] with regard to cooperation."  Although appellant admitted that her lawyer, her social worker and her parent aide all reviewed the terms of the protective order with her on multiple occasions and explained the consequences of violating it, appellant "took it as a joke."

The protective order required, inter alia, (1) that appellant "shall take the job through the Supported employment program as soon as it becomes available"; (2) that appellant shall continue to cooperate with all services and service providers; (3) that J. shall not be transported in any vehicle operated by appellant's mother, Cathy West, or any unlicensed driver; and (4) that appellant shall permit no more than one hour of supervised contact per week between J. and West. Appellant had reported that West resented appellant because appellant was a product of incest, that West was a drug addict

-

who had exchanged sex for drugs and had taken financial advantage of appellant, and that West's former boyfriend was J.'s father, a fact confirmed by paternity testing. In addition, appellant had allowed West to drive J. to and from daycare, even though appellant knew West had no driver's license or auto insurance.

In late May 2001, Social Worker Dorinda Eggers learned that West was residing with appellant and J. in violation of the protective order and that appellant was likely to be evicted from her subsidized housing because her lease prohibited overnight guests. Although appellant received an eviction notice in June 2001, she failed to vacate the premises and made no other arrangements for housing before she was physically evicted on September 18, 2001. Despite her impending eviction, appellant refused the "supported employment" position she was to begin on September 4, 2001. Appellant also was uncooperative with Atkins after entry of the protective order; by August 23, 2001, appellant "got real hostile" and said "she did not want [Atkins] there" anymore.

When appellant was evicted on September 18, 2001, sixteen months from the date on which J. was first placed in foster care, DSS removed J. from appellant's custody a second time. When appellant still had failed to make adequate housing arrangements ten days later, DSS sought the termination of appellant's parental rights. Social Worker Eggers testified

-

that appellant's eviction was only one of several factors which led DSS to seek termination. Eggers expressed a broader concern about appellant's "inability" "to adequately parent" and "to look ahead . . . as any parent should be able to do in order to protect their child from danger." In addition to housing and employment issues, the evidence established that appellant was not feeding J. adequately and was not "doing the things that [DSS was] asking her to do, such as reading to [J.] to stimulate his speech." When J. was returned to foster care in September 2001 at 18 months of age, he could say only two words, one of which was "bitch," and he demonstrated aggressive behavior toward other children. Within his first month in foster care, appellant's aggression decreased and the eighteen-month-old gained five pounds. Finally, despite repeated assistance with employment and budgeting, appellant had been employed only sporadically because she sought jobs she appeared intellectually incapable of performing and refused a full-time "supported employment" position with benefits and training which was within walking distance of her residence.

Eggers said that, although no one service could teach a parent to adequately anticipate all dangers, appellant had received a variety of services which provided help in this area, including Welcome Home Baby, homemaker services, parenting classes and in-home parent aide services. Despite these services, Eggers, Thayer and Atkins testified that appellant's

-

parenting skills had not improved since they began working with her, and Eggers "did not know what more services [to] provide . . . that would help to overcome the problems that [appellant and J.] were having."  In addition, appellant had ceased cooperating with the myriad services offered.  When the CASA advocate again reviewed appellant's case, she agreed with Eggers' termination request based on appellant's refusal to cooperate with services and her inability to parent J. without those services.

The evidence supported a finding that DSS offered appellant 23 different services designed to address, to the extent possible, all areas of concern and that, when appellant ceased cooperating with these services, she was unable to parent effectively.  DSS was not required "to force its services upon an unwilling or uninterested parent."  <u>Harris v. Lynchburg Div. of Soc. Servs.</u>, 223 Va. 235, 243, 288 S.E.2d 410, 415 (1982).  As the trial court found, even after appellant's receipt of these services, she was "still at square one" in regard to her "ability to provide the basics for [J.]" without ongoing assistance.

Thus, as the trial court further observed, whether appellant's ongoing problems "resulted from a mental block on following instructions or simply an inability to perform and make judgments and act," the evidence supported a finding that appellant, without good cause and for a period exceeding twelve

-

months, failed "to substantially remedy" those conditions "which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end."  Code § 16.1-283(C)(2); see Richmond Dep't of Soc. Servs. v. L.P., 35 Va. App. 573, 582-85, 546 S.E.2d 749, 753-55 (2001) (holding that parent with severe and likely permanent mental deficiency which prevented parent from caring for child could, nevertheless, have parental rights terminated and that such mental deficiency did not constitute good cause preventing termination under Code § 16.1-283(C)(2)).

For these reasons, we affirm the termination of appellant's parental rights.

Affirmed.